IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA,      )      **Case No. 3:17-MJ-00917-BK**
                               )
          Plaintiff,           )
                               )      Dallas, Texas
v.                             )      December 15, 2017
                               )      2:00 p.m.
CHRISTOPHER MAURICE DANIELS,   )
                               )      DETENTION HEARING
          Defendant.           )      PRELIMINARY HEARING
_____)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PAUL D. STICKNEY,
UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:

For the Government:        Jennifer Tourje
                           UNITED STATES ATTORNEY'S OFFICE
                           1100 Commerce Street, 3rd Floor
                           Dallas, TX  75242-1699
                           (214) 659-8600

For the Defendant:         Lara Wynn
                           FEDERAL PUBLIC DEFENDER'S OFFICE
                           525 Griffin Street, Suite 629
                           Dallas, TX  75202
                           (214) 767-2746

Recorded by:               Lavenia Price
                           UNITED STATES DISTRICT COURT
                           1100 Commerce Street, Room 1452
                           Dallas, TX  75242-1003
                           (214) 753-2168

Transcribed by:            Kathy Rehling
                           311 Paradise Cove
                           Shady Shores, TX  76208
                           (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

| | |
|---|---|
| 1 | <u>DALLAS, TEXAS - DECEMBER 15, 2017 - 2:14 P.M.</u> |
| 2 | THE COURT:  The Court calls United States of America |
| 3 | versus Christopher Maurice Daniels. |
| 4 | MS. TOURJE:  Jennifer Tourje for the Government. |
| 5 | THE COURT:  Thank you. |
| 6 | MS. WYNN:  Lara Wynn for Mr. Daniels. |
| 7 | THE COURT:  Thank you, Ms. Wynn.  This is Case No. |
| 8 | 3:17-mj-917.  We're here on a criminal complaint for probable |
| 9 | cause and detention.  Is the Government ready to proceed? |
| 10 | MS. TOURJE:  Yes, Your Honor. |
| 11 | THE COURT:  Is the Defense ready? |
| 12 | MS. WYNN:  Yes, Your Honor. |
| 13 | THE COURT:  All right.  The Government may call its |
| 14 | first witness. |
| 15 | MS. TOURJE:  Thank you, Your Honor.  The Government |
| 16 | calls Special Agent Aaron Keighley. |
| 17 | THE COURT:  If you would raise your right hand. |
| 18 | (The witness is sworn.) |
| 19 | THE COURT:  Thank you. |
| 20 | AARON KEIGHLEY, GOVERNMENT'S WITNESS, SWORN |
| 21 | DIRECT EXAMINATION |
| 22 | BY MS. TOURJE: |
| 23 | Q   Good afternoon. |
| 24 | A   Good afternoon. |
| 25 | Q   Could you spell your name for the record, please? |

1   A   Aaron Keighley, K-E-I-G-H-L-E-Y.

2   Q   How are you employed?

3   A   Special agent with the Federal Bureau of Investigation,

4   Dallas Division.

5   Q   How long have you worked for the FBI?

6   A   I started with the FBI in 2003.

7   Q   And are you the case agent in the case before the Court

8   today?

9   A   I am.

10  Q   Do you see the person in the courtroom that you know as

11  Christopher Maurice Daniels?

12  A   Yes.

13  Q   Could you point to where he may be and describe something

14  that he is wearing or something distinctive about his

15  appearance?

16  A   Seated at the defense table, wearing an orange -- orange

17  clothing.

18        MS. TOURJE:  Your Honor, could the record reflect that

19  he's identified Mr. Daniels?

20        THE COURT:  It will.

21  BY MS. TOURJE:

22  Q   Special Agent Keighley, how did Mr. Daniels come to the

23  FBI's attention back -- let me direct your attention to March

24  of 2015.

25  A   So, in March 2015, there was a demonstration that was held

Keighley - Direct                              4

1  in Austin, Texas, that Mr. Daniels participated in.

2  Q    And how do you know that that was?  Was that videotaped?

3  A    It was.  It was -- it was videotaped and it was aired by

4  several different organizations, one of which was infowars.com.

5  Q    That's a website?

6  A    It is.

7  Q    And what caught your attention in watching that video?

8  A    It was -- it appeared to be an anti-law enforcement

9  demonstration, which included anti-law enforcement slogans.

10 Q    And in the video, did you see Mr. Daniels?  Was he

11 portrayed in the video?

12 A    Yes.

13 Q    And the group that is marching, are they chanting anything?

14 A    They are.  They were chanting several things, consisting of

15 "Oink oink bang bang."  "The only good pig is a pig that's

16 dead."  And there were a few others that I think are contained

17 in the report.

18 Q    And that is -- that drew your attention, the FBI's

19 attention, because of the threats to law enforcement?

20 A    That is correct.

21 Q    You have reviewed the exhibits contained in Government

22 Exhibit 1; is that correct?

23 A    Correct.

24 Q    And I've given a copy to defense counsel.  Are those -- is

25 Government Exhibit 1 six pages of various Facebook posts by Mr.

Keighley - Direct                              5

1   Daniels that you have either seen or it's been brought to your

2   attention?

3   A    Yes, ma'am.

4   Q    And do each of these Facebook pages fairly and accurately

5   depict what was shown on Mr. Daniels' Facebook page?

6   A    Yes, it does.

7   Q    Do you know Mr. Daniels to use an alias?

8   A    I do.

9   Q    And is that alias Rakem -- forgive my pronunciation --

10  Khafre Balogun?

11  A    That is one of them, yes.

12  Q    Do you know him by any other aliases?

13  A    Yes.  Also, just Rakem Khafre.

14  Q    And how would you spell that, for the record?

15  A    R-A-K-E-M.  K-H-A-F-R-E.

16  Q    And are the Facebook posts contained in Government Exhibit

17  1 under that name?

18  A    They are.

19          MS. TOURJE:  Your Honor, I'll tender to the Court

20  Government Exhibit #1 and offer it into evidence.

21          THE COURT:  All right.  Any objection?

22          MS. WYNN:  No objection, Your Honor.

23          THE COURT:  It's admitted.

24      (Government's Exhibit 1 is received into evidence.)

25  BY MS. TOURJE:

Keighley - Direct                                    6

1   Q    Directing your attention, Special Agent Keighley, to Page

2   #1, is that from August of 2015?

3   A    It is.

4   Q    And let me clarify.  On Page 1 of Government Exhibit 1,

5   there is a handwritten note in the upper corner that says "8-

6   2015."  Is that your handwriting?

7   A    It is.

8   Q    Aside from that, this is Mr. Daniels' post; is that

9   correct?

10  A    That is correct.

11  Q    And did you note that on there because when it's documented

12  on the Facebook post, on this particular page, on Page 1, it

13  says it was 16 hours ago, but actually it was back in 2015; is

14  that correct?

15  A    Correct.

16  Q    And on Page 1, what is significant about this post?

17  A    So, the significance of this post is that it appears to be

18  a news clip, an Action 5 news clip regarding a fugitive

19  investigation, or a manhunt, if you will.  The picture of the

20  gentleman there is Tremaine Wilbourn, and Tremaine Wilbourn was

21  a suspect in the slaying of a Memphis police officer.  The

22  caption that is posted next to it is, "Salute to a Real" -- or,

23  "Salute a Real Hero."

24  Q    And that was posted by Mr. Daniels?

25  A    Correct.

Keighley - Direct                                    7

1   Q   On Page 2 -- before we get to that, let me just put for the

2   record, on July 7, 2016, just down the street here in downtown

3   Dallas, were five police officers gunned down by a person known

4   as Micah Johnson?

5   A   Yes, ma'am.

6   Q   And were those officers from the DART Police Department,

7   the Dallas Area Rapid Transit, and four officers from the

8   Dallas Police Department?

9   A   Yes, ma'am.

10   Q   And was Mr. Johnson also known as Micah X?

11   A   Yes, ma'am.

12   Q   Was Mr. Johnson killed after a standoff with police?

13   A   Yes, ma'am.

14   Q   In anticipation and surrounding the one-year anniversary of

15   the murders of those police officers, did Mr. Daniels post

16   anything on his social media?

17   A   He did.

18   Q   And is that depicted in Government Exhibit 1, Page 2?

19   A   It is.

20   Q   And can you describe the significance of that to the Court?

21   A   So, the first one is a post of a dallasnews.com article

22   talking about the July 7th ambush, and the caption there is,

23   "They deserve what they got.  LMAO!"

24   Q   And from your training and experience and living in the

25   social media/texting world, what does LMAO stand for?

Keighley - Direct                                    8

1   A    Laughing My Ass Off.

2   Q    At the shooting of the police officers?

3   A    Correct.

4   Q    On Page 3 of Government Exhibit 1, what does that show?

5   A    So, this is kind of a notification or a posting, if you

6   will, that happens on Facebook when somebody changes their

7   profile picture or the main picture that you see when you come

8   onto their page.  And this is saying that Mr. Daniels updated

9   his profile picture, and the picture there is a picture of Mr.

10  Johnson.

11  Q    That's of Micah Johnson prior to the July 7, 2016 murders;

12  --

13  A    Correct.

14  Q    -- is that correct?  On Page 4, is this from July 7, 2017?

15  A    It is.

16  Q    And what does that show?

17  A    That shows Mr. Daniels wearing a t-shirt that shows a

18  picture of an AK-47.  It also shows two crime scene photos from

19  the July 7, 2016 incident where Micah Johnson was killed.  The

20  caption there is, "I'm wearing brown and khaki in solidarity

21  for Micah X.  #77."  And the significance of #77 is, of course,

22  July 7th.  Yeah, July 7th.

23  Q    So, on Page 4 of Government Exhibit 1, he's showing his

24  solidarity with the murderer of the police officers; --

25  A    Correct.

Keighley - Direct                                    9

1   Q    -- is that correct?

2   A    Correct.

3   Q    And on Page 5, is that also from July 7, 2017?

4   A    Yes.

5   Q    And this is Page 5 of Government Exhibit 1.  And in this,

6   is Mr. Daniels reposting on Facebook a post from somebody else?

7   A    He is.

8   Q    And what does that post say?

9   A    It says, "Tomorrow they will mourn the police.  We will be

10  saluting Micah Johnson.  We will remember Philando Castile,

11  Alton Sterling, and others, with revenge in our hearts."

12  Q    And finally, on Page 6 of Government Exhibit 1, also from

13  July 7, 2017, the one-year anniversary of the Dallas shootings,

14  what did the Defendant post on his Facebook?

15  A    The caption there is, "Today, one year ago, one black man

16  brought Dallas Pig Department to their knees.  #77."

17  Q    Did you learn that Mr. Daniels planned to attend a training

18  event on November 18, 2017 in Detroit, Michigan?

19  A    Yes, ma'am.

20  Q    Did you also learn that the Defendant placed a firearm in

21  his checked luggage for his flight from DFW Airport to Detroit?

22  A    Yes, ma'am.

23  Q    Upon his return to Dallas from Detroit the next day,

24  November 19, 2017, did you learn what happened to Mr. Daniels'

25  luggage?

1   A   Yes.  He requested that it be delivered to his residence in

2   Dallas.

3   Q   So he wasn't able to pick it up; there was a delay with the

4   luggage?

5   A   Correct.

6   Q   The DFW Airport and the Defendant's apartment in Dallas,

7   are those both in the Northern District of Texas?

8   A   They are.

9   Q   And the Defendant's apartment, Mr. Daniels' apartment, is

10  that known as the Rock Creek Apartments?

11  A   It is.

12  Q   And at some point, did surveillance see Mr. Daniels return

13  to that apartment from the airport?

14  A   They did.

15  Q   And have you also seen Mr. Daniels leave from that

16  apartment and go to his job in Carrollton?

17  A   Yes, we have.

18  Q   Did you obtain documentation from the airline, which is

19  Spirit Airlines, that Mr. Daniels possessed and subsequently

20  checked a firearm on or about November 18, 2017?

21  A   We did.

22  Q   Was that a claim check with his signature and a bag tag?

23  A   It was.

24  Q   Did Spirit Airlines tell you what would happen to the other

25  half of the claim check?

1   A    Yes.  They claim that a person would retain the other half

2   of the claim check and that's what they would use to pick up

3   the item.

4   Q    Did you also learn from them what type of firearm was

5   checked?

6   A    Yes.

7   Q    Was that a Taurus Poly Protector 38 Special +P .38 caliber

8   handgun?

9   A    Yes.

10  Q    Did you check with the airline to find out if the luggage

11  was actually delivered to the Rock Creek apartment?

12  A   I did.

13  Q    And is that the address that Mr. Daniels gave where it

14  should be delivered?

15  A   It was.

16  Q    Did you also learn that Mr. Daniels was prohibited from

17  possessing a firearm?

18  A   I did.

19  Q    Was Mr. Daniels convicted of domestic assault in February

20  of 2007 in Tennessee?

21  A   He was.

22  Q    Have you -- excuse me.  Was that conviction a misdemeanor

23  crime of domestic violence?

24  A   It was.

25  Q    Have you reviewed that judgment and conviction?

1   A    I have.

2   Q    And does it state anything on that judgment and conviction

3   concerning firearms?

4   A    It is handwritten, presumably by the judge, that he is not

5   to possess a firearm.

6   Q    Does it state on there that Defendant advised he cannot

7   possess a gun?

8   A    It does.

9   Q    So, he is a prohibited person from possessing a firearm; is

10  that correct?

11  A    That is correct.

12  Q    As part of your investigation, did you get a search warrant

13  signed by Magistrate Judge Ramirez for the Rock Creek apartment

14  to look for the firearm and the claim check, among other items?

15  A    We did.

16  Q    Was that executed by the FBI this past Tuesday, December

17  12, 2017?

18  A    It was.

19  Q    And were you present for the search at some point?

20  A    I was.

21  Q    Can you please describe the apartment?

22  A    So, it was a --

23  Q    Generally.

24  A    A one-bedroom apartment.  Living area, kitchen, one bedroom

25  and a bathroom, with a cot and a couch in the living area, in

1  the living room.

2  Q    Were any firearms recovered?

3  A    Yes.  Two firearms were recovered.

4  Q    Was one of them the Taurus .38 handgun that I referenced

5  earlier?

6  A    It was.

7  Q    And where was that located?

8  A    It was located on a nightstand next to the bed.

9  Q    Was it loaded?

10  A    It was loaded.

11  Q    In connection with that weapon, did you consult with the

12  Alcohol, Tobacco, Firearms Bureau to see if it had traveled in

13  interstate commerce?

14  A    We did.

15  Q    And did it?

16  A    It did.

17  Q    What other weapon was recovered?

18  A    There was a Norinco brand AK-style assault rifle.

19  Q    And where was that located?

20  A    It was located within inches of the foot of the bed.

21  Q    And you said that there was a cot in the apartment as well.

22  Was that in the bedroom or --

23  A    It was in the living area.

24  Q    Okay.

25  A    In the living room.

Keighley - Direct                    14

1   Q    So the mattress and the bed was in the bedroom?

2   A    Was in the bedroom, yes.

3   Q    Was that rifle loaded or unloaded?

4   A    The rifle contained a magazine but the magazine was empty.

5   However, there was a fully-loaded magazine also within arm's

6   reach of the bed.

7   Q    Was any ammunition recovered?

8   A    Yes.  Somewhere between 50 to 100 7.67 caliber ammunition.

9   Q    Was there also body armor located in the apartment?

10  A    There was a body armor in the apartment.

11  Q    You said that there was a cot in the living room?

12  A    Yes.

13  Q    From your understanding, who was staying on the cot?

14  A    There -- I believe there was a juvenile that was staying --

15  I believe when they made entry that was where he was laying or

16  where he was sleeping.

17  Q    Were there any other indications that children lived in

18  that apartment?

19  A    Yeah.  There were a few child items.  There were -- there

20  was a child's -- several child's backpacks.  Also, notebooks,

21  homework, things of that nature.

22          MS. TOURJE:  I'll pass the witness, Your Honor.

23          THE COURT:  Cross?

24                    CROSS-EXAMINATION

25  BY MS. WYNN:

1  Q    Good afternoon, Agent Keighley.

2  A    Good morning.

3  Q    Whenever you made of contact with Mr. Daniels upon entry of

4  his apartment, was he compliant with officers?

5  A    He was.

6  Q    And so you had no issues to any commands and he didn't

7  resist at all --

8  A    No.

9  Q    -- when encountered?

10 A    He did not.

11 Q    And you noted that one of the weapons recovered was the

12 Norinco, and you said it was an AK-style rifle?

13 A    Yes.

14 Q    So, it wasn't -- you're not saying that it is, say, an AK-

15 47 or an AR-15 type?  It's just that particular style of rifle?

16 A    Yes.  And forgive me, I'm not a weapons expert, but an AK-

17 47 is a specific manufacturer.  The AK abbreviation is a

18 specific manufacturer.  So it looks like one but it's made by a

19 different company.

20 Q    Okay.  And regarding your review of Mr. Daniels' social

21 media, did you recover any evidence of any statements by Mr.

22 Daniels specifically saying he would harm a law enforcement

23 officer?

24 A    No, not specifically.

25 Q    Okay.  And did you recover any statements from Mr. Daniels

1  saying that he specifically wanted to harm a law enforcement

2  officer?

3  A   Not necessarily specific.  The only one that kind of comes

4  to mind is there was a video in which he kind of made comments

5  about, look at my history, I'm not afraid to get violent, or

6  something to that effect.  Or, yeah, so I can't quote it

7  exactly because it came from a video.  It wasn't like a written

8  posting.  But something to that nature.

9  Q   And was that video from the Austin protest of March of

10 2015?

11 A   No.  That's a video that currently exists on his Facebook

12 page.  I'm not sure when it was posted or where it was from,

13 what time frame, but it exists there now.

14 Q   And have you recovered any evidence of Mr. Daniels

15 specifically directing another individual to cause harm to a

16 law enforcement officer?

17 A   No.

18         MS. WYNN:  Pass the witness, Your Honor.

19         THE COURT:  Thank you.  Other questions?

20         MS. TOURJE:  No further questions, Your Honor.

21         THE COURT:  All right.  You may step down.  Thank you,

22 sir.

23         THE WITNESS:  Thank you.

24     (The witness steps down.)

25         THE COURT:  What other evidence from the Government?

1      MS. TOURJE:  Your Honor, the Government would just
2  proffer the contents of the Pretrial Services report, and then
3  we'll rest.

4      THE COURT:  Thank you.  For the Defense?

5      MS. WYNN:  No witnesses, Your Honor.  We would just
6  proffer that as far as ties to the community, Mr. Daniels does
7  have several close family members here in the audience today
8  supporting him, including his 15-year-old son and his I believe
9  five-month-old daughter.  And then we'll just save for
10  argument.  Thank you, Your Honor.

11      THE COURT:  Okay.  For the Government?

12      MS. TOURJE:  Your Honor, the Government would submit
13  that it has proved the elements of the offense alleged in the
14  complaint so that probable cause has been established for
15  possession of a firearm by a prohibited person.

16      As for detention, the danger to the community, in
17  connection with the instant offense of possessing a firearm,
18  not only on November 18, 2017 but also when law enforcement
19  executed the warrant on December 12th, as defense counsel just
20  proffered, there are small children who had access -- well,
21  she'd proffer that there are small children having contact with
22  the Defendant.  Also, from Special Agent Keighley's testimony,
23  a minor was in the apartment when there was a readily
24  accessible AK-47 style rifle as well as a loaded handgun.

25      Mr. Daniels' criminal history in the Pretrial Services

1   report is a history of assaultive prior arrests and

2   convictions.  And in that, as to flight, is a failure to appear

3   on the aggravated assault case, which was subsequently lowered

4   to the domestic violence conviction that is the subject of the

5   prohibited person.

6        In addition, he gives inconsistent information to Pretrial

7   Services when he's interviewed, given that of his mother as

8   well.  So there is -- for example, his mother doesn't -- has

9   not been to the apartment.  She doesn't think that he's

10  married, and then he says that he is married.  But, really, the

11  totality of the evidence here is that he's a danger to the

12  community, there is a risk of flight, and the Government would

13  submit that there's sufficient evidence to detain Mr. Daniels

14  pending trial, that there's no condition or combination of

15  conditions that would ensure the safety of the community.

16          THE COURT:  Thank you.  Lara?

17          MS. WYNN:  Thank you, Your Honor.  Regarding the

18  flight risk for Mr. Daniels, he does have a home here in the

19  Northern District of Texas.  And as testified by the agent,

20  they observed him leaving to go to work.  And he does have, as

21  I proffered, many family, friends, and children who live here,

22  including his parents.  And so he has significant ties to this

23  particular community.

24       Going towards the danger to the community, as the agent

25  testified, he himself has not made any statements or any

1    indications that he has any desires to harm law enforcement

2    officers or have anyone else do so.

3        And of course, the First Amendment is one of the

4    cornerstones of our democracy, and it allows individuals to

5    make statements or espouse opinions that others may not agree

6    with, or share the opinions of others that may not be kind or

7    may in fact be hateful.  But if they do not cross a line in

8    which they are going to incite violence, and he himself has not

9    indicated that he wants to partake in any sort of violence like

10   that, then his statements, however they are viewed by the law

11   enforcement, they are simply protected by the First Amendment

12   and he should not be detained because they don't agree with the

13   statements and the opinions that he may have.

14       They're also relying on his criminal history that dates

15   back to over ten years ago.  His misdemeanor conviction for

16   assault was in February of 2007, so we're going on almost 11

17   years ago.  There's been no evidence presented that he has

18   engaged in any sort of behavior of that sort in the past

19   decade.

20       And so we would ask Your Honor to deny the Government's

21   motion to detain and find that there are adequate conditions in

22   which to assure Mr. Daniels' appearances as required and the

23   safety of the community.  Thank you, Your Honor.

24            THE COURT:  Thank you.

25       The Court does find there is probable cause to believe a

1  crime was committed and that Mr. Daniels committed it.

2  Includes prohibited person in possession of firearms.

3      In addition, based on the evidence as presented here today,

4  the Court finds that Mr. Daniels, I don't really have any

5  evidence that he's a risk of flight, but I do find that he's a

6  danger to the safety of the community.  I order him detained

7  during the pendency of this action.

8      What else for the Government?

9          MS. TOURJE:  Nothing, Your Honor.

10         THE COURT:  For the Defense?

11         MS. WYNN:  Nothing further, Your Honor.

12         THE COURT:  Thank you.

13     (Proceedings concluded at 2:35 p.m.)

14                       --oOo--

15

16

17

18

19

20                     CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the digital sound recording of the proceedings in the above-
22 entitled matter.

23     **/s/ Kathy Rehling**                    **12/28/2017**

24 _____    _____

25 Kathy Rehling, CETD-444                     Date
   Certified Electronic Court Transcriber

1                                    INDEX

2   PROCEEDINGS                                                2

3   WITNESSES

4   Government's Witnesses

5   Aaron Keighley
6   - Direct Examination by Ms. Tourje                         3
    - Cross-Examination by Ms. Wynn                           14

7   EXHIBITS

8   Government's Exhibits                    Identified Received

9   1      Facebook Pages                        4         5

10  RULINGS                                                   19

11  END OF PROCEEDINGS                                        20

12  INDEX                                                     21

13

14

15

16

17

18

19

20

21

22

23

24

25